You may proceed. Thank you, Your Honor. May it please the Court, George Strayer appearing for Mr. Gimenez. Your Honor, there are four certified issues and one uncertified issue in the briefs, and I know that we're not going to have time to do all of that. I was wondering if the Court had any specific concerns or questions it would like me to get to right away so that there will be time to at least address those. Do we have any Supreme Court authority as to what happens if you have expert testimony that's not a lie? I mean, we all know what happens if you have witnesses that turn out to lie and so on. But this is somebody who truthfully testifies, and then it turns out that the science is later undermined. You're asking for a square Supreme Court holding on that point? I'm afraid that would be the gold standard, you know, and if you had one of those, you'd be… No, there's not. So without a square Supreme Court holding, why aren't we back at Cavazos? For two reasons. One is that's a merits consideration and we're here on a motion to dismiss. So at some point I'm going to have to answer that question directly, but that's after this Court reverses the dismissal and we get to a hearing on the merits of the is this contrary to or an unreasonable application under 2254 D1. We're not there. The second reason is the Panetti case, which we cite in the reply brief, which indicates that you don't always need a square holding if you have general principles that you apply to a new factual situation. So I'm not sure the extent to which the absence of a square holding would deny us relief if we were before you on the merits of the false evidence issue. Counsel, there was a case about three weeks ago from the Supreme Court, Maryland v. Kulbicki. There was? Okay, well, I was going to ask you your thoughts on that case, but… I have none. Okay, fair enough. I'm so sorry. I didn't know that that was coming, and I haven't read it, so I have no thoughts on it. I'll do a very quick summary. In that case, someone was convicted on ballistics evidence, which has later been pretty much uniformly rejected, that the lead analysis done by the FBI has been proven to be bad, and courts have now said that it's bad. And the Maryland Court of Appeals in that case held that there should be a pretty much automatic Strickland reversal here because the lawyer should have argued that the lead evidence was bad. Should have anticipated it. Should have anticipated it, should have figured it out, and should have argued it. And the Supreme Court, this is probably why you haven't heard about it, it was a summary reversal and said, no, we can't put the lawyer as a Carnac-type figure. Now, I would agree that addresses some of the issues in this case, the question of whether the lawyer was Strickland-deficient, and it may not directly address the key argument in this case, but if that's a case from the Supreme Court two and a half weeks ago, it does seem to shed some light on what the outcome of this case could be. And I apologize if you haven't had a chance to look at it, but assume my recollection is correct of this case, if you could speak to that. So, my understanding, that case is an IAC, an ineffective assessment? It is. So, you're just talking about the ineffective assistance of counsel issues? And what can we glean from that principle onto a merits analysis in this case? Of the IAC merits? Putting aside the IAC, whether or not, one of your arguments in the case I believe is that actual innocence, correct? Correct. And is there, well, look, you haven't read the case, I don't want to take up my colleague's time trying to reconstruct something that you haven't read. If you'd like, I mean, I'd be happy to do supplemental research. If you could do a 28-J on that case, that would be great. Thank you. That might be the better way to go. Okay. So, this brings us back to. . . Yeah, your question, Your Honor. I hope I answered it because you seem to be upset when people don't. Well, the question is whether or not. . . I mean, there are several sort of back-to-back questions, but I guess one of them is, is this. . . Do you have evidence showing that, in fact, the science on this has been reversed? Yeah. Or is it just merely a dispute? No, it's. . . You know, at this point, it's not a dispute. I mean, in the reply brief, I go into that in more detail with more articles and so on and so forth and more statements from the outliers who stick to the old try it only SPS. I want to make clear that we're only talking about try it only SPS, not SPS as some other sort of principle. So, the government says that there is a battle of the experts, that there is dispute, but there is nothing that says we used to think these were signs of shaken baby syndrome, and now we know they're not. So, there's nothing like that, and I didn't see anything in the record either. So, when you say that the science has been overturned, I'm not sure what exactly you're referring to. Well, there are things that say that. They do say what you say that they don't say. They actually do say that, that the science has changed. I saw that the science had changed and there was more doubt, but it seemed like this was still evidence of shaken baby syndrome. It just perhaps was not dispositive, or that some scientists thought it wasn't dispositive. No, I mean, the dispute in general terms is between pediatricians on one side who say this is still good and forensic pathologists on the other side, which says in the context of determining a cause of death, this is bad. So, what is this in what you just said? This is the latter. No, no, this is still good, this is bad. I'm sorry, try it only SPS is good according to pediatricians. Now explain to me what try it SPS, just articulate what you're referring to. In try it only SPS, there are three sort of symptoms within the victim. You have subdural hematoma, you have retinal hemorrhaging, and you have brain swelling. So, that's all you have, but you have no physical injury, no neck injury, no head injury. And the dispute is, are those three symptoms sufficient for a diagnosis of shaken baby syndrome and sufficient for a conclusion? So, it's the sufficiency issue that we're really looking, that you're saying the science has changed on, or that there's a dispute about now. Yes, yes. And you say the weight of the evidence is that it's not sufficient, though the government says there's still dispute on that. Yeah, it's sort of like, it's comparable to the scientific dispute on climate change, if you will. The overwhelming majority of pathologists, the ones who must make a determination of, is this the cause of death, say this is bogus. Currently, they say. In 1992, when this case was originally tried, they didn't say that, but over the course of time, it's become clearer and clearer and clearer that that is not the case. And the scientific basis for it, it's not just like my opinion, but the scientific basis for it is biomechanical research. And those articles that I cite in the reply, I sort of try to highlight that. So, even if it's not sufficient, let's say that the weight of the scientific evidence is it's not sufficient. The government also argues that, at a minimum, it's evidence of shaken baby syndrome, that that was the cause of death. Do you disagree with that? Based on the current science, I disagree with that. Yeah, there's just no reputable pathologist who would say that anymore. I mean, that's our point. It's gone so far that there's no reputable pathologist who would say that. That those three symptoms you described were evidence of. Were sufficient. I'm not saying sufficient, I'm saying, would they be evidence along with other evidence? I mean, evidence is that you can get in anything you want, I suppose. But, I think that it would not be, I mean, evidence, yeah, very weak evidence. So, I guess that that's the best way to say it. What is it in the record that tells us that that is the state of the law? The government seems to present a different picture of the state of the law. I'm sorry. Not the state of the law. The state of the science. Of the science. You say the consensus has shifted and all but a few outliers now have repudiated the entire theory. The government says no, it's sort of more evenly balanced. And we haven't had a factual, we haven't had a hearing on this, so how do we know? The only way that, you're right, there hasn't been a hearing. But the only way that we know is by reviewing the literature that talks about the subject and the case law that applies that literature to specific cases. So, if you look at the, I mean, I listed the argument. Is that something we do? Is that something the district court does? You know, I think that if this case were to be retried, there would be a Daubert hearing on, is this stuff the... I mean, I guess that's sort of what I'm getting at. Are you sort of arguing for a post-Daubert hearing? Essentially to say, validate this and if the... I'm thinking out loud a little bit, but I was also... Having been there for Daubert, both... Are you asking for us to send it back for a post-Daubert hearing, basically? Well, I mean... Is that what it is? I wasn't asking for that. I wasn't asking what you were asking for in the past. I'm asking for it now. I'm asking, of course, what you're asking now, that you've sort of heard the idea. I mean... I think Judge Ikuda alluded to that as well. I'm not suggesting that's what should happen. Yes. But I'm trying to envision what it is that we are trying to determine and how. And I just feel not entirely competent to decide what the state of science is. That's the kind of thing trial judges, district judges do. In Daubert hearings. I mean, part of the problem is we're here on a motion to dismiss. It's hard to weave in exactly what happens. Let me skip over that then, because I think you don't have a good answer for it right now. I don't. Maybe on your way back to... San Diego? San Diego. Right. It'll hit you on the head. I should have said this. In which case you can put in a 28-judge letter. I'm going to do one anyway, apparently. Yes. Anyway. Let me skip over that question, which I think is an important question that we're going to have to grapple with. Let's say the district court here had held the kind of hearing I'm talking about. Just held the hearing and had determined, consistent with your view, that the scientific consensus has shifted, so that all but the drunk or crazy scientists now repudiate the trial theory. Got it. Yeah, I understand. That the trial theory is no longer good science. So let's say that we had that as a finding in the record. So what? That was then. This is now. It's not even clear that you have a due process right to be released if you prove yourself innocent. Herrera left that question open. Sort of assumed that if you can actually bring six bishops in who say, he was with me during the time of the crime, somehow you can prove your absolute innocence, you could probably get out of jail. But we're not even sure of that. So let's say in fact these are early scientists in 1992. They come in. They do their very best. They testify. The jury believes them. And now in 2015, we in fact have the kind of hearing I suggested. And the district judge says, you know, this is all… Bogus. I think bogus is too… Yeah, right. Bogus. Not that they were making… They did their best then, but it's sort of like the advance in science. It's a new… The science has changed. It turns out the earth rotates around the sun, not the other way around. So what does that give you in terms of what constitutional consequence is there from that? I think that… That presupposes that the way it was done then was constitutionally fine then. Yeah. No, I understand. Yeah. I think that actually… So we've raised three clusters of issues. I think that the one that that specifically goes to is the false… You know, unwittingly false evidence under this court's cases that talk about that's sufficient in order to constitute a due process violation, denial of a fundamentally fair trial. So I think that that… It goes to that issue. And as to… Are you talking about, like, Philip Fiorinowski where a witness was tricked? I'm talking more about Young, Killian, Hall. Because those were all perjured jailhouse informant perjury. Yeah, but Young doesn't say that. Young… It's on page 23 of the opening group. It's Young and Killian and Hall which all say that, you know, even if it's not done wittingly, that's done in good faith, but it's false, that still denies a fundamentally fair trial. And then the Jensen case, which is from the Eastern District, says, well, that's a due process violation. So it's that theory that a conviction based on false evidence denies due process is fundamentally unfair and denies due process. So that would be one basis for assuming, you know, Judge Kosinski's scheme that the judge makes a fine that this is not good science anymore. But the other, I think, is actually actual innocence. I'm a little bit, I think that the actual innocence claim is a better claim than most people think because of the Davis case decided by the United States Supreme Court in 2011, which is also cited, I think, about page 32 of the opening brief, where the court on habeas sent the case back to the district court judge to make a determination of whether the defendant was actually innocent. That's a holding. That's the holding in that case. Fair enough. It's not in bold type with exclamation points, but that's what it said. And the only thing you can conclude from that is that if the judge, and this was the district court, Southern District of Georgia, if it had found actual innocence, it would have granted relief. It found that the guy wasn't actually innocent. But you don't have an actual innocence claim here. We do. We do. A cluster of claims is actual innocence, yes. Based on the scientific evidence? The scientific evidence is not going to prove your client innocent. It's merely going to prove that the way, I'm assuming you succeeded in all that, it's merely going to show an absence of sufficient evidence. That's a long ways from proving your client actually innocent. Yeah, I'm sorry. I was unclear. The actual innocence claims, there are about seven or eight of them. That's the key, but there are several others as well concerning other medical stuff that was used to corroborate the triad of SPS symptoms. I'm not sure how any of that gets you to actual innocence. Actual innocence would have you having somebody else doing it? No, no, no. No crime. Or having a diagnosis that the baby died of cancer? You know, something that's not, I mean, that's what actual innocence would look like. We have that. Just whittling down the scientific evidence they presented then will at best get you to a not guilty. We have among the actual innocence claims is a conclusion supported by two pathologists and two neuropathologists that the likely cause of death was a brain bleed from birth that worsened over time and led to a stroke on the 48th, 49th day. That means that there was no crime. It's not that someone else did it. It's that the baby died of natural causes. But that's not connected to this issue. It is. It's the alternative. I mean, what caused death? Triad-only SPS or a brain bleed from birth leading to death? Now, the search circuit in Lee seems to have gotten out front on this issue. Yeah. Lee is actually very close. I mean, not precisely this point. But in principle, it's exactly what this is. New scientific or expert evidence, if you will, that completely refutes the evidence on which the conviction is based. And that being a due process violation. So, actually, the third circuit supports me directly. The fearless Judge Sloboda. Well, thank God. I'll tell her you said that next time I see her. Okay. I'm sure that she'd appreciate it. Your Honor, can I have the name of the case again that I'm writing? Sure. It is Maryland v. Kulbicki. Could you do the last part? I can do Maryland on my own. K-U-L-B-I-C-K-I. It was decided October 5th by the court. It's a summary reversal. So, it actually appears at the end of all the pro forma orders, admitting people to the bar, and sort of denied, and all of a sudden, at the very end, there's about a six-page opinion there. Okay. Thank you. I think we've taken up more than your time. Unless my colleagues have more questions, we'll give them the stage. Thank you, Your Honor. Good morning, Your Honor. May it please the Court. I'm Kevin Viena, California Deputy Attorney General for Appellee Respondent in this matter. Was there ever a hearing? Good to see you again, Mr. Viena. It's nice to be here. I hope I'm not as famous after this hearing as the last one, Your Honor. I hope so as well. I think 29,000 YouTube hits is where we are now. Too bad you can't profit from them. Well, I was at least a minor celebrity. A media star. There was a hearing of sorts in this case, and that is in the state courts when Jimenez filed his habeas corpus petitions. It wasn't dealt with as is typically the case in the state's courts. There wasn't simply a summary denial. There was instead the issuance of an order to show cause and the response by the district attorney's office, an extensive response that addressed many of the factual claims that were made by Mr. Jimenez. And a couple of those, I'd point simply to a couple of things that I think completely, well, I think refute Jimenez's claim that the strong body of scientific evidence rejects the evidence that was used to convict Mr. Jimenez in this case. First of all, Dr. Iselli, who was the pathologist, was not able to give a statement because he's passed away. But one of his successors in the San Diego medical office, Dr. Christina Stanley, did review his testimony and his reports. And she said, I adopt. And she is a forensic pathologist. Mr. Schreier says that there are only pediatricians that disagree with his client's view of the science here. She is a forensic pathologist. And she said, I adopt everything that Dr. Iselli said. That is, this is a homicide case. The evidence in this case shows homicide. Now, also before the state court, from Dr. Stanley, was some new evidence provided to that state court with regard to his claims of actual innocence. And Dr. Stanley said, I reviewed some slides of brain tissue, and I see axonal shearing. That is, damage to the axons in the brains. And the significance of that is this. The theory of abusive head trauma, or shaken baby syndrome, is that an injury to the head that comes from a collision or from shaking, severs the axons, axonal shearing. That leads to inflammation that eventually shuts down blood flow and leads to death. So what Dr. Stanley says is, not only do I agree with everything that Dr. Iselli said, but now I see direct evidence of injury that is not a passive bleeding problem that existed from birth until death. But I see evidence of injury, axonal shearing. The district court, I think, did a terrific job in the type of examination of the scientific evidence that you were describing, Your Honor. Magistrate Judge Barbara Major, in a very extensive report and recommendation, said that I don't see this evidence. I see some conflict, and some of their evidence is not particularly good. That is, for example, their theory is that this child had a birth injury that progressed over the period of six weeks that resulted in her death. But the Magistrate Judge Major says, I look at this evidence, and no one, even now, for Mr. Jimenez, seems to point to the aging or any healing injury. That is, the evidence that's present from blood that heals in the brain, a neomembrane's form, no one dates any bleeding to more than about three weeks before the death. In fact, that was consistent, I think, with the prosecution's theory that the shaking occurred on at least three different instances, roughly over that one month period. And that's exactly what Dr. Ascelli said. He said, I see some neomembranes that are a couple of weeks old. I see another injury on August 7th. It would be consistent with the child's presentation at the emergency room on August 7th. And then a massive injury that occurs at about the time of August 10th, which is the final set of injuries for the child. I've indicated that I think Magistrate Judge Major did a terrific job on the factual findings, or what I think is really a factual finding. She said, I see not a single bit of evidence, or I see not a single bit of testimony by any of the prosecution's experts that is false. And I think that's the sort of typical fact-finding done by district court to assess whether there was false evidence or not. And she says, there's no false evidence in this case. There are some experts who disagree with some of what they've said. Dr. Alexander, who testified for the prosecution in the case, and wrote a textbook on abusive head trauma in 2006, and was asked whether he retracted that, you know, whether he thinks anything he said in 1992 was wrong, did not. He continues to believe that abusive head trauma is the explanation for what happened to this child. Mr. Jimenez talks about some controversy about whether the child had the typically associated injury of a broken rib, because shaking a child hard enough to cause head trauma often involves squeezing the child around the chest and breaking a rib. And Mr. Jimenez's evidence is that there may have been something unusual in the rib area on an x-ray taken shortly after birth. But no one, other than Dr. Asili, looked at the rib itself, microscopically. And he dated that rib fracture, identified a rib fracture, and dated it as several weeks after birth. So this is not really a case of actual innocence. They have not, and I would suspect cannot, show actual innocence, even if it were a legal theory, a proper legal theory. And I think it may be at some point if it's not. It is a proper legal theory in California today, and that was evaluated by the Superior Court. And the Superior Court said, I don't see innocence. I see a conflict in the evidence that comes from new and different experts. The District Court in adopting Magistrate Judge Major's report and recommendation made, in my estimation, two mistakes. The first one, the one I wish they'd solved, was we also moved to dismiss this petition as untimely. Magistrate Judge Major agreed that if you look at the latest possible date that seems to be present for the development of new information by Mr. Jimenez, then the one-year statute of limitations still has expired before he files his federal habeas corpus petition. The other error I think that Judge Houston made is he said, I'm not exactly sure what sort of showing needs to be made. You mean Judge Burns? Excuse me, Judge Burns. I'm sorry. Thank you. On the question of whether Mr. Jimenez has shown sufficiently a constitutional error that gets him over the bar for a second or successive petition. Judge Burns cited some cases that looked not at the standard to be applied by the District Court in evaluating a motion to dismiss, but instead looked at the standard to be applied by a circuit court of appeals, which is a prima facie case. But if you get to the District Court, the District Court is required to show that all of the requirements are met, and at least Bible v. Shuro, which is cited in the Magistrate Judge's report and recommendation 651 F. 3rd 1060 at 1064 note 1, says there should be a searching inquiry. And when you conduct that searching inquiry, Mr. Jimenez hasn't shown innocence. He hasn't shown constitutional error. He hasn't shown an entitlement to a second or successive petition. If the Court has no questions. Thank you. Could I take a minute for a moment? The Court's been generous with its time, so I'll just make two brief points. The citation to the stuff that was introduced by experts in the Superior Court way back when is not part of the record in this case, because this stems from the Court of Appeals ruling, not the Superior Court's ruling. And in the Court of Appeal, the prosecutor did not lodge those exhibits, those declarations.  Now, they put them in their excerpts of record, because in the excerpts of record you put whatever you want, I guess. But that was not part of the basis of the ruling that's under review in this Court, so I just point that out. The stuff about evidence of innocence. I just want to emphasize we have two pathologists and two neuropathologists who say this baby died from a cause other than shaking. If that's not evidence of innocence, I don't know what is. Thank you. Thank you. Two minutes. We are adjourned.
judges: Kozinski, Ikuta, Owens